**STOP THE PIPELINE,**
**et al., Plaintiffs,**

v.

**Thomas E. WHITE, et al., Defendants.**

**No. C2–02–842.**

United States District Court,
S.D. Ohio,
Eastern Division.

Nov. 22, 2002.

960

Richard Clyde Sahli, Columbus, OH, for plaintiffs.

James C. Wilson, U.S. Attorney's Office, Columbus, OH, for Thomas E. White, Robert B. Flowers, John D. Rivenburgh, defendants.

Stephen Douglas Jones, Roetzel & Andress, Columbus, OH, John D. Fognani, R. Kirk Mueller, Robin M. Hunziker, for Ohio River Pipe Line, LLC, defendant.

### OPINION AND ORDER

SARGUS, District Judge.

This matter is before the Court on the Cross–Motions for Summary Judgment filed by Plaintiffs, Stop the Ohio Pipeline and Jane Ann Ellis ("Plaintiffs"); Defendants Thomas E. White, Secretary of the United States Department of the Army; Lieutenant General Robert B. Flowers,

Commander and Chief of Engineers, United States Army Corps of Engineers; and Colonel John D. Rivenburgh, District Commander, United States Army Corps of Engineers ("Federal Defendants")[1]; and Defendant Ohio River Pipe Line, L.L.C. ("ORPL"). For the reasons that follow, Plaintiffs' Motion for Summary Judgment is denied; Federal Defendants' Motion for Summary Judgment is granted; and ORPL's Motion for Summary Judgment is granted.

### INTRODUCTION

As more fully addressed below, this Court is asked to review the decision of the Army Corps of Engineers to issue a permit to the Ohio River Pipe Line, L.L.C. concerning the installation of a fourteen inch petroleum products pipeline to extend 149 miles from Kenova, West Virginia to Columbus, Ohio.

The decision to grant or deny such permits is vested with the Army Corps of Engineers. While the Corps must comply with a number of federal environmental laws described in detail below, the ultimate discretion as to the sanctioning of the project rests with the agency.

The role of this Court is both important and limited. Congress has directed by statute that any aggrieved party may obtain relief in a federal district court if an agency, such as the Army Corps of Engineers, has failed to follow the required procedures and analysis which must precede the issuance of a permit authorizing the type of project at issue in this case. Federal law does not, however, authorize or permit a federal district court to exercise the authority of an agency, such as the Corps, as to the ultimate question of whether the pipeline should or should not be constructed.

1. Plaintiffs have named all of the Federal Defendants in their official capacities.

Further, this case involves a claim by the Plaintiffs that the Corps, given the scope of the pipeline project, should have required a full environmental review, known as an Environmental Impact Statement, to precede the granting of the permit. Instead, the agency prepared only an Environmental Assessment, an abbreviated environmental review. Were this Court authorized to determine on its own whether an Environmental Impact Statement should be issued, the result would be different. Federal law, however, places discretion to make such decision with the Corps. As described below, this Court may reverse the Corps' decision only if it is arbitrary or capricious, one of the highest legal standards imposed on a plaintiff and one which simply has not been met in this case.

This Court would be remiss if it did not note that the quality of the pleadings, briefs, and oral arguments presented by the attorneys in this expedited case was of an exceptionally high quality.

## I.

This case arises following the administrative decision of the United States Army Corps of Engineers ("Corps") to issue a water pollution permit authorizing the construction of a 149 mile long pressurized pipeline, fourteen (14) inches in diameter, to be used for transporting liquid petroleum products from Kenova, West Virginia to a storage facility in Columbus, Ohio. Plaintiffs challenge the lawfulness of the Corps' decision in issuing a dredge and fill permit (# 199800424–4, also referred to as "404 permit") to Defendant ORPL authorizing ORPL to fill 354 streams and 54 wetlands in the course of the pipeline's construction. (AR 16, p. 21–26.[2]) The

pipeline will be built by ORPL and operated by Marathon Ashland Pipe Line, LLC.

As described in ORPL's application for the 404 permit, the pipeline was designed to transport over 3.3 million gallons of refined petroleum products from West Virginia to a storage terminal in Columbus, Ohio. (AR 16, p. 84.) According to the June 4, 2002 report of the Office of Pipeline Safety ("OPS"), a component agency of the United States Department of Transportation, the fuel in the pipeline will be under high pressure, up to 1,480 pounds per inch. (AR 16, p. 208.) Construction will require the complete clearing of a seventy-five (75) foot right-of-way along the majority of the 149 mile route, clearing 1,350 total acres, and a permanently cleared fifty (50) foot right-of-way. (E.A., AR 16, p. 88.) The pipeline will generally be buried to a minimum of 36 inches. (OPS report, AR 16, p. 209–10.) The pipeline's operations will be monitored from a control center in Findlay, Ohio, which will oversee the pressure levels within the pipeline. (AR 115, p. 210–211.)

As relevant to the Plaintiffs herein, the pipeline would traverse the public lands of Hocking Hills in southeastern Ohio, through several Ohio parks including the Hocking State Forest, Crane Hollow State Nature Preserve, and the Clear Creek Metro Park and State Nature Preserve. (AR 16, p. 89, 92.) The Hocking State Forest is a unique and popular tourism and recreation area of Ohio. (AR 16, p. 92.)

About 80 percent of the pipeline route lies within existing pipeline corridors, powerline rights-of-way, excess landfill property, surplus airport property, developed lands and surplus highway rights-of-way. (AR 16, p. 103.) In Hocking County, Ohio, where Plaintiffs' efforts have focused, oil

---

**2.** The administrative record throughout this Opinion and Order shall be referred to as "AR __, p. __." The first reference is to the volume within the entire administrative record and the second relates to page within the volume as numbered in the bottom right-hand corner.

and gas pipelines and high voltage power lines already exit on the area to be effected by the proposed pipeline. Seventeen (17) miles of the proposed pipeline route crosses portions of Hocking Hills State Forest. Most of the seventeen (17) miles of the proposed pipeline in this area will be installed within an existing utility corridor and will concurrently replace the existing 80–year old pipeline. (AR 16, p. 89.) An additional portion will run along an existing, dedicated roadway.

In the Hocking Hills State Forest, ORPL purchased the whole of an existing natural gas pipeline easement, called the "FR–25" line, which runs in Ohio from northern Jackson County through all of Vinton County and almost all of Hocking County. (AR 16, p. 92; AR 16, p. 218.) The FR–25 easement covers 37 miles of the 149–mile pipeline route.[3] (AR 12, p. 7507.) Plaintiffs advocate that the use of this 37–mile route along the FR–25 easement has numerous shortcomings with regard to the Hocking Hills and the public lands there. FR–25 pipeline is old, having been installed in 1916. More recently, the right-of-way has been poorly maintained and much overgrowth has occurred. (AR 16, p. 92, AR 12, p. 7509.) Plaintiffs note that the FR–25 was sited many decades before the development of modern environmental science and regulatory policy, making it very unlikely that its original location was based on any sound environmental rationale. Plaintiffs further point out that FR–25 is capped and out of service in its northern reaches and has rusted through in numerous areas.

With regard to the important environmental and biological value represented by the public lands in the Hocking Hills, the existing FR–25 right-of-way contains areas that have "not been cleared for many years" and are "overgrown." (AR 16, p. 92.) Public commentators noted that the easement in some locations has mature trees that are 20 to 30 years old. (AR 2, p. 7507.) The entire FR–25 right-of-way through Crane Hollow State Nature Preserve is so overgrown that the tree canopy closes overhead so that no predator access is created. (AR 16, p. 139.) The forested nature of this segment is especially important due to the wildlife habitat it provides within the public lands. Both the Crane Hollow State Nature Preserve and Clear Creek Metro Park have been designated as "Important Bird Areas" because their expansive and unfragmented forest allow nesting for many high priority neotropical bird species.[4] (AR 16, p. 131.) During public hearings on this matter,[5] many commentators described the Hocking Hills unique habitat for neotropical birds and the significant impact that the clearing the pipeline would have on these birds. During the hearings, concern was expressed that clear cutting the 75 foot right-of-way along the FR–25 easement would cause forest fragmentation and would have a seriously negative impact on these neotropical birds that are dependent on closed forest canopies to survive by allowing a pathway for invasion by destructive, non-native predatory animal and plant species. (AR 16, pp. 131–132, 136; AR 12, pp. 7574–7580, 7496–7503, 7522–7530.)

---

3. The easement was originally granted to The Ohio Fuel Supply Company and ORPL eventually acquired it. In litigation challenging the easement, the state courts of Ohio have held that ORPL has a right to clear cut a 50–foot easement for maintenance of the pipeline and to clear cut an additional 25 feet for temporary work space. (AR 15, 170–171; AR 15, p. 197–200.)

4. Many of the neotropical bird species unique to the Hocking Hills habitat are rare, but are not considered federally endangered. (AR 12, p. 7577.)

5. Further discussion of the public hearings appears *infra*.

Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*, ("FWPCA") requires any person or entity seeking to place dredge or fill materials into navigable waters to obtain a permit from the Corps. Because ORPL's proposed construction of the pipeline would involve the release of sediment into in or in the vicinity of various streams and wetlands that are by law navigable waters of the United States, the project requires a 404 permit. Further, the decision whether to issue or deny such permit triggers the application of the National Environmental Policy Act ("NEPA"). 42 U.S.C. § 4321 *et seq.*

Under the Clean Water Act, 33 U.S.C. § 1344 *et seq.*, the Corps has authority to issue both individual and general permits. An individual permit is a project-specific authorization that is granted only after review of an application containing a complete description of the proposed activity and a period of public comment. 33 C.F.R. §§ 325.1(d), 325.2(a). In addition to individual permits, the Corps may grant authority under one is its 44 general permits, also called "nationwide" permits, which are designed to cover routine activities that are "similar in nature" and involve only minimal environmental impacts. 33 U.S.C. § 1344(e)(1).

ORPL originally applied for coverage under a general permit. (AR p. 2451–2581.) The Corps began the reviewing process under the criteria for a nationwide permit, but ultimately rejected the application as exceeding the criterion of minimal environmental impact. (AR 5, 2265–2266, 2267.)

Therefore, on September 13, 2002, ORPL applied for its individual permit. (AR 8, complete application.) Before an individual permit may be issued under the FWPCA, the public must be given an opportunity to comment on the project. The decision to require ORPL to obtain an individual permit also obligated to Corps to conduct a specific review of the project pursuant to NEPA.

■ The Corps issued the water permit on August 2, 2002. The permit was not preceded by an Environmental Impact Statement ("EIS") pursuant to NEPA.[6] Instead, the Corps issued a more limited Environmental Assessment ("EA"). (AR 16, p. 82–109(EA)). The Corps prepared the EA, examining potential individual and cumulative effects as well as the social and economic impacts of the project. (AR 16, p. 82–109.)[7] The Corps also convened two public hearings and solicited written comments from the public to permit interested parties to make statements regarding the project. (AR 12–12A, p. 7344–7625; AR 12, p. 7154–7342, AR 9, p. 5038–5041.[8]) ORPL prepared a summary and response to the oral and written public comments and provided it to the Corps. (AR 14B, p. 2–199.) Ultimately, the EA was used to determine whether the action would signif-

---

**6.** NEPA requires that, in the event that the issuance of an individual permit would "significantly affect[ ] the quality of the human environment," the administrative agency must prepare an EIS. 42 U.S.C. § 4332(2)(c). *See* Section III, *infra*. An environmental impact statement is an extensive project, with specific analysis as to all facets of the project's effects on the environment. *Hodges v. Abraham,* 300 F.3d 432, 438 (4th Cir.2002.)

**7.** An EA is a "concise public document that briefly provide[s] sufficient evidence and anal-

ysis for determining whether to prepare an EIS or a finding of no significant impact." 40 C.F.R. § 1508.9. An EA "[s]hall include brief discussion of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9. *See* Section III, *infra*.

**8.** Public comment was heavy. See discussion of opponents' commentary, *supra*.

icantly affect the human environment. Because the Corps determined, based on the EA, that the pipeline project would create no significant environmental impact and determined that "no short term or long term significant adverse impacts are expected as a result of this proposal" (AR 16, p. 109), it issued its decision in a Finding of No Significant Impact ("FONSI"). (AR 16, p. 110–179 (FONSI)). In its Statement of Findings in the FONSI, the Corps concluded that no EIS was required to approve the 404 permit.

Plaintiffs move the Court for an order granting summary judgment on the grounds that the Corps violated federal laws and regulations governing approval of the environmental permit to ORPL. Defendants opposed the Plaintiffs' Motion and seek summary judgment on the administrative record in their favor.

## II.

This matter is before the Court for judicial review of an administrative agency's final decision under the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* ("APA"). The record before the Court on these Cross–Motions for Summary Judgment consists of the administrative record compiled by the Army Corps of Engineers at the time it made its final appealable action by issuing the 404 permit and the FONSI on August 2, 2002. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 421, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ A court reviewing an administrative agency's decision is compelled to set aside the agency's final action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 704; *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997). The Court must determine whether the agency's final determination

"was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. This inquiry must "be searching and careful," but "the ultimate standard of review is a narrow one." *Id.* While this standard requires deference to agency decisions, deference does not "shield [an agency's] action from a thorough, probing, in-depth review". *Id.*

Agency action has been described as arbitrary and capricious when:

> [T]he agency has relied on factors which Congress had not intended to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency enterprise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

■ When faced with competing views of qualified specialists, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, "even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). The Supreme Court has further noted:

> On the other hand, in the context of reviewing a decision not to [prepare] an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evalua-

tion of the significance-or lack of significance-of the new information.

*Id.*

■ Summary judgment must "be rendered forthwith" if there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Here, the administrative record provides the complete factual predicate for the Court's review on the parties' Cross–Motions for Summary Judgment. Under these standards, the Court must determine the lawfulness of the Corps' decision not to prepare an EIS. In arriving at its conclusions, this Court does not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814. "[D]isagreement … in the methodologies employed is generally not sufficient to invalidate an EA (environmental assessment). (The Court) should simply determine whether the challenged method has a rational basis and took into consideration the relevant factors." *Committee to Preserve Boomer Lake v. Dep't of Transportation,* 4 F.3d 1543, 1553 (10th Cir.1993). Indeed, "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of action to be taken.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (citation omitted). Executive agencies are empowered under NEPA to exercise discretion within the parameters established by Congress; this Court decides only whether the pro-

posed action falls within such parameters, not whether the decision is sound public policy.

**III.**

■ In 1969, Congress enacted the National Environmental Policy Act ("NEPA"), "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA is "our basic national charter for protection of the environment" and serves the chief goal of ensuring that high quality "environmental information is available to public officials and citizens before decisions are made." 40 C.F.R. § 1500.1.[9] Under NEPA, federal agencies are required to take a "hard look" at the environmental implications of the agency's action or inaction. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). NEPA does not require that federal agencies achieve particular environmental results but rather, "compels agencies to collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions." *Southwest. Williamson County Community Ass'n, Inc. v. Slater,* 243 F.3d 270, 278 (6th Cir.2001) (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)).

NEPA requires federal agencies to prepare an "Environmental Impact Statement" ("EIS") for every major federal action "significantly affecting the quality of

---

**9.** In 1977, former President Carter issued an Executive Order empowering the Council on Environmental Quality ("CEQ") to promulgate federal regulations in furtherance of the purpose and policy of NEPA. The CEQ has promulgated the regulations governing actions under NEPA at 40 C.F.R. Parts 1500 to 1508, which are applicable to all federal agencies.

the human environment." 42 U.S.C. § 4332(2)(C). In order to determine whether an EIS is necessary, the administrative agency first conducts an "Environmental Assessment" ("EA"). 40 C.F.R. § 1501.4(b)-(c). An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact." 40 C.F.R. § 1508.9. An EA "[s]hall include brief discussion of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

If the agency determines, based on the EA, that no significant environmental impact exits, the agency issues its decision in a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1501.4(e). Alternatively, the agency may conclude that a more detailed EIS is warranted. Either decision constitutes "final agency action" for purposes of NEPA and thus, triggers judicial review under the APA.

The agency's determination of the "significance" of a major federal action involves consideration of the project's "context" and "intensity." 40 C.F.R. § 1508.27. "Context" refers to analyzing the action in terms of "society as a whole (human, national), the affected region, the affected interests and the locality." 40 C.F.R. § 1508.27(a). "Intensity" refers to the "severity of the impact" and requires consideration of several factors, including two of special significance in this case:

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmland, wetlands, wild and scenic rivers, or ecologically critical areas.

40 C.F.R. § 1508.27(b).[10]

 As the United States Supreme Court has held, decisions under these regulations are entitled to "substantial deference." *Marsh*, 490 U.S. at 372, 109 S.Ct. 1851. Furthermore, in reviewing an agency's decision to issue a FONSI rather than

---

10. The remaining "intensity" factors are as follows:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

\* \* \* \* \* \*

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate

a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1528.27(b)(1), (4)-(10).

to prepare an EIS, the Court must determine whether the agency took a "hard look" at the project's effects. The Court will overturn an agency's decision not to issue an EIS "only if it is found to be arbitrary, capricious, or an abuse of discretion." *Sierra Club v. Slater,* 120 F.3d 623, 635 (6th Cir.1997). The burden is on the challengers to show that the agency's decision to not prepare an EIS was erroneous. *See Rosebud Sioux Tribe v. Gover,* 104 F.Supp.2d 1194, 1207 (D.S.D.2000).

Plaintiffs contend that the Federal Defendants violated the policies and procedures required by NEPA when issuing the permits under the Federal Water Pollution Control Act for the pipeline project. Plaintiffs argue that the EA and FONSI are unlawful in four primary respects, in that each fails adequately to consider, analyze and determine with respect to the pipeline project: (1) public safety impacts; (2) purpose and need; (3) alternatives for meeting the real fuel needs of central Ohio; and (4) impacts of wildlife habitat loss and forest fragmentation.

Plaintiffs vigorously maintain that these deficiencies in the EA and FONSI necessitate an order vacating them and the 404 permit that they authorized. Plaintiffs request that the Court remand this matter to the Corps with instructions to assess these impacts more fully and to prepare a full EIS. Plaintiffs maintain that the Corps was in clear error when it did not require an EIS for a project of this scope and geographic impact. The Court now turns to each of these propositions.

### (1.) *Public Safety Impacts*

■ Plaintiffs contend that the Corps never specifically assessed the risk to the environment and the public posed by potential leaks and spills from the pipeline. The public, Plaintiffs point out, expressed concern that accidental release of the petroleum products from the pipeline would cause explosions and fire that could seriously harm people, near-by property and the environment. These safety concerns are exacerbated by the fact that the pipeline's isolated, rugged location compromises prompt or effective emergency response. (AR 16, p. 141.)

Instead of any independent risk analysis of these safety hazards, Plaintiffs assert that the Corps inappropriately deferred to the Office of Pipeline Safety ("OPS") report on all safety issues. (AR 16, p. 88(EA); AR 16, p. 164 (FONSI).) Plaintiffs contend that OPS, in turn, did not actually assess the significance of leaks and spills in its nine page report. (AR 16, 207–212). Plaintiffs maintain that the OPS report has an insufficient level of detail and information related to safety, indicating only that OPS found the pipeline consistent with its minimum design standards.

Plaintiffs further contend that the OPS report did not fully consider safety issues in that it merely adopted the conclusion of the permit applicant, ORPL, as set forth in ORPL's own "Alternatives Report." (AR 16, p. 207–1.) The Alternatives Report did not consider safety issues related to spills but focused only on impacts to surface water. OPS's method of deferring to the Alternatives Report without an independent verification of the conclusions made by the applicant, according to Plaintiffs, violates NEPA's requirement to establish insignificance of impact. Citing *Calvert Cliffs' Coordinating Com., Inc. v. United States Atomic Energy Com.,* 449 F.2d 1109 (D.C.1971), Plaintiffs allege that the Corps arbitrarily and capriciously relied on OPS. In effect, Plaintiffs argue that the Corps abdicated its responsibility as the lead agency under NEPA to OPS, which in turn improperly relied on ORPL's own report.

The Court concludes that the Corps properly solicited and considered OPS's evaluation. An agency may fulfill its ob-

ligations under NEPA to conduct an independent evaluation of environmental impacts by reviewing and relying on the information, data and conclusions supplied by other federal or state agencies. NEPA in fact encourages lead agencies to obtain comments from other agencies with relevant expertise. *See Save the Bay, Inc. v. United States Corps of Engineers*, 610 F.2d 322, 325–26 (5th Cir.1980) (NEPA "requires that federal agencies consult with other agencies whose area of expertise is superior to their own.") Plaintiffs' position that the Corps must conduct its own independent evaluation or otherwise independently verify all data goes beyond the well-settled prohibition against an agency reflexively rubber stamping a third-party report. Here, the Corps did not abdicate its responsibilities by failing to conduct independent studies and by considering the evaluations of OPS concerning the pipeline's potential adverse effects.

The Code of Federal Regulations and related case law caution that, when an agency delegates the task of preparing an EA to an applicant or solicits information from outside consultants, acceptable work completed by parties outside the agency need not be redone. *See* 40 C.F.R. § 1506.5(a). If the Corps or any agency "permits an applicant [or another agency or consultant] to prepare an *environmental assessment*, the agency ... shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment." 40 C.F.R. § 1506.5(b) (emphasis added); *see Seattle Audubon Soc. v. Lyons*, 871 F.Supp. 1291, 1319 (W.D.Wash. 1994) (lead agency did not abandon duty under NEPA to evaluate independently by deferring to report of an assessment team); *Save the Bay, Inc. v. U.S. Corps of Engineers*, 610 F.2d 322, 325 (5th Cir.), *cert. denied*, 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980) (noting that information submitted by applicant which forms entire the basis for EA must be verified).

Here, the Corps prepared its own EA. With regard to the single issue of the safety and operation of the proposed pipeline, the Corps recognized OPS's expertise and responsibility for administering the regulations governing design, construction, operation and maintenance of pipelines. *See* 49 C.F.R. Part 195 (containing pipeline safety standards for petroleum products pipelines.) Consistent with that regulatory responsibility relating to pipeline safety, the Corps requested OPS to evaluate the potential for leaks or spills. (AR 16, p. 100.) OPS, in turn, through regional officers, attended various meetings with ORPL and other public agencies, and attended the two public hearings before passing on the issue of the pipeline's safety. The Corps quite properly relied on the professional opinions provided by OPS with regard to safety issues within that agency's expertise. In addition, OPS did not then simply opine as to whether the proposed pipeline complied with general standards; the OPS report specifically analyzed the proposal, the location and the monitoring of the pipeline.

The Corps did not, as Plaintiffs would seem to suggest, completely abdicate its independent obligation under NEPA to assess whether the project significantly impacted the human environment. It relied on the expertise of another federal agency with superior expertise on a single issue. Consulting with this agency was wholly proper. 42 U.S.C. § 4332(2)(C). This determination, however, does not lead to the conclusion that the Corps could base its final decisions or could adopt a complete EA wholesale without critical, independent verification. The Corps simply deferred to OPS on subjects that fell within the purview of that agency's expertise.

Neither does the record support Plaintiffs' position the Corps did not independently consider the public safety impacts of the pipeline because it relied exclusively on the OPS and, in turn, OPS relied exclusively on the "Alternatives Report" submitted by the applicant, ORPL.[11] The administrative record reflects that the Corps independently pursued answers to the safety concerns raised by the members of the public. The record further confirms that OPS relied on more than the Alternatives Report alone in arriving at its conclusions. The record reflects that the Director, Central Region, of OPS met several times with ORPL over the previous two year period to discuss the proposed pipeline. (AR 4, p.2058–59.) Correspondence in the record reveals that OPS received and reviewed planned construction specifications, project design and schedule information. (AR 4, p.2058–59.) OPS, as the agency regulated by and charged with enforcement of issues of pipeline safety, indicated that it was "satisfied with the information presented by ORPL and believ[ed] that safety issues expected to be addressed by a proposed project of this type are being appropriately addressed." (AR 4, p.2058.)[12]

Plaintiffs maintain that Corps was under an obligation to undertake a risk assessment and to independently project a verifiable estimate of both the consequences that might occur and the probability of a pipeline accident. Citing *City of New York v. United States Dept. of Transp.*, 715 F.2d 732, 746 (2d Cir.1983), Plaintiffs contend that the Corps should have engaged in the "accident risk" model used by the Department of Transportation in which it considered "the risk that highway transportation of radioactive materials through urban centers might result in an accident of potentially serious dimensions." *Id.*[13] Regardless of the nomenclature, the Corps did in fact review, assess, and determine the risks the proposed pipeline poses to the public and the environment. In determining that the pipeline met various generalized as well as specific safety considerations, OPS performed a risk analysis, which the Corps reviewed and ultimately adopted.

The administrative record confirms that the Corps took the requisite "hard look" at safety issues. The Corps fulfilled its duty pursuant to NEPA to evaluate the significance of the pipeline's public safety impacts in determining whether an EIS was necessary. It competently sought the

11. Plaintiffs suggest the entirety of the Corps' review of safety-related issues in contained in a single paragraph under the heading "Safety" in the Corps' Statement of Findings. (Plaintiffs' Memo. in Sup. of MSJ, p. 28.) For the reasons provided above, this suggestion is not supported in the administrative record.

12. Further, the Corps informed OPS that it had received numerous letters concerning the safety of the pipeline and invited OPS to attend the public hearings. (AR 9, p. 4053.) OPS responded to the Corps, accepted the invitation to attend the hearings, and again reiterated its view that it did not have any safety concerns over the project. (AR 13, p. 283–284.) Following the hearings, the Corps again requested that OPS provide detailed comments and concerns relating to any safety

issues regarding the proposed pipeline, and specifically to evaluate the potential for leaks and spills. (AR 15, p. 432.) OPS concluded that ORPL, under its proposal, had "reduced the potential for pipeline failure as far as practicable." (AR 15B, p. 6.)

13. The risk analysis evaluated the possible consequences of an accident and then discounted those consequences by the statistical improbability of their occurring. *City of New York*, 715 F.2d at 746.

The Court notes that the Second Circuit's concern in the *City of New York* case about transporting radioactive materials through a large urban center is not precisely analogous to the conditions posed by the installation of the pipeline in this case.

views of OPS on issues falling within that agency's area of expertise. The proposal for the pipeline itself incorporates numerous safety precautions, monitoring programs, and is designed meet or exceed all requirements of 49 C.F.R. Part 195. (AR 8, p. 2989; AR 15B, p. 15B, p. 11, 15–17; AR 15B, p. 10.) The Corps' public safety impacts analysis was neither arbitrary or capricious. Accordingly, the Corps' FONSI is upheld in this regard.[14]

### (2.) *Purpose and Need*

■ Pursuant to 40 C.F.R. § 1508.9(b), an environmental assessment "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." The EA issued by the Corps here states, under the assessment of views concerning probable effects of the proposed work, that the "project is designed to help alleviate fuel shortages and unpredictability in the Central Ohio region." (AR 16, p. 99.) Plaintiffs maintain that the EA does not factually support the existence of fuel shortages by giving any specific instances or reasons for such shortages that would justify a pipeline to correct them. Instead, Plaintiffs argue that the Corps, in the EA, merely implied the existence of a need by stating that the current pipeline system to Central Ohio is near capacity and "the applicant indicates that the petroleum demand growth rate in central Ohio is projected to be around 2.9 per cent per year for the next 10 years."

(AR 16, p. 99.) Plaintiffs contend that the issue of "fuel shortage" is dependent upon accurately forecasting future fuel needs and "unpredictability" is dependent on ascertaining why the system may be come unpredictable, in addition to determining whether this pipeline will remedy those causes. Plaintiffs maintain that neither of these critical factors establishing need for the project has received a hard look by the Corps. Specifically, Plaintiffs suggest that ORPL's projected growth rate of 2.9% is not substantiated and ORPL's data regarding refinery closures and limitations are mere "conjecture."

The record reflects that the Corps' determination of the purpose and need for the pipeline project is not so narrow and fact-dependent as the Plaintiffs would suggest. The concise, most pointed statement of the purpose and need for the proposed project appears in the FONSI, which provides that "the purpose and need for the project is to provide an efficient, economical and safe method for transporting refined petroleum products to the Central Ohio Region in order to meet both current and future demands." (AR 16, p. 152.) The basic purpose for the project is more broadly and fundamentally as "provid[ing] fuel to the central Ohio area." (AR 16, 149.)

■ Initially, agencies are entitled to considerable deference in their definition of purpose and need. *E.g.*, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059 (9th Cir.1998). Moreover, NEPA requires agency to "briefly specify the un-

---

14. Plaintiffs point to an EIS that was required for construction of the Yellowstone Pipeline Permit renewal project as an example of the type of safety analysis that the Corps should have taken in this case. The Court agrees with Defendants that this type of argument invites the Corps and ORPL to submit a list of the numerous pipelines that have been approved pursuant to a nationwide permit, which would not require an individualized EA let alone an EIS. Moreover, the Yellowstone Pipeline had the potential to impact several endangered species, including the gray wolf, the grizzly bear, the bald eagle and the Canada lynx. (AR 12, p. C. 8–4.) In contract, ORPL's pipeline does not impact any federally endangered animals.

derlying purpose and need" for the proposed project. 40 C.F.R. § 1502.13. The purpose and need statement simply defines the goals of the project to allow for the review of an appropriate range of alternatives. *Citizens Against Burlington v. Busey IV*, 938 F.2d 190, 195–96 (D.C.Cir.1991).

Plaintiffs challenge the data relied upon by ORPL regarding demand and growth rates. They critique the growth-rate figure as wholly unsubstantiated. The 2.9 per cent figure derives from ORPL's 404 application, in which ORPL indicated that the figure is conservative and based on statistics from the United States Department of Labor, Department of Energy, and Department of Transportation. (AR 9, p. 2805.) Yet, Plaintiffs own experts, Growth Associates, relied on similar data and arrived at a 1.7 per cent annual growth rate projection for petroleum demand.[15]

Plaintiffs' reading of the purpose and need statement, as well as the Corps' duty to specify these aspects of the project is too narrow. The record supports the conclusion that the Corps did not arbitrarily and capriciously accept ORPL's statement of purpose and need. The record contains evidence of a rapid growth in petroleum demand in Central Ohio. Further, the Corps considered comments in the record both supporting and opposing the stated purpose and need for the project. (AR 16, p. 123–38, 147–48.) The record supports the conclusion that the Corps, while generally focusing on the applicant's statement of proposed need, exercised independent judgment in defining the purpose and need of the pipeline.

Plaintiffs do not suggest that the record is bereft of any indication of need; they instead disagree that the record contains any independent verification of a 2.9% growth rate or evidence of unpredictability. It is not disputed by the Plaintiffs' that the population of Central Ohio has grown significantly in the last decade and the growth trend is expected to continue. The record, however, when viewed more appropriately in the context of the Corps' broadly stated purpose and need for the project, provides ample evidence of need for petroleum in the expanding metropolitan Central Ohio area. NEPA does not require that an agency conduct an independent analysis of the proponent's goals with regard to an underlying project. "[I]t would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose it deems more suitable." *Louisiana Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir.1985). The Corps appropriately determined that a valid public need existed for the pipeline. ORPL and others who commented on the project submitted information regarding the need for the pipeline, which provided a reasonable basis for the Corps' judgment that the Pipeline would serve an important public need. The Corps therefore was not arbitrary and capricious in reaching its conclusion with regard to the stated purpose and need for the project.

(3.) *Alternatives for Meeting the Fuel Needs of Central Ohio*

██ Because they argue that the Corps did not seek to verify the real needs of the Central Ohio market for more fuel,

---

**15.** Growth Associates analyzed the projected growth rate for all of the State of Ohio. (AR 16, p. 209.) ORPL's data concentrated on the vicinity of Central Ohio. Moreover, the record demonstrates that the growth rate for Central Ohio is twice as fast as the state as a whole.

(AR 8, p. 2805.) Growth Associates determined that the existing three pipelines into the area actually will provide excess capacity by the year 2009, based on their need/growth calculations. (AR 12B, p. 8056.)

Plaintiffs argue that the Corps likewise could not know what alternatives it should have reviewed in its preparation of the EA. On that basis, Plaintiffs suggest that the Corps' alternatives analysis was a preordained formality.

Plaintiffs contend that the alternatives analysis conducted by the Corps arbitrarily ignored the ability of truck or rail transport to satisfy any legitimate future needs by measuring it against a totally arbitrary supply need of 50,000 barrels per day. The Corps judged all alternatives based on the criteria of transporting 50,000 barrels a day—the capacity of the pipeline which, Plaintiffs contend, is a figure unrelated to Central Ohio's actual fuel needs. According to Plaintiffs, evaluating the options of moving an inflated 50,000 barrels a day by rail or truck tilts the alternatives analysis in favor of the pipeline.

Yet, the record clearly reveals that the Corps evaluated whether the alternatives that were assessed could practicably achieve the project purpose. (AR 16, p. 151–155; AR 14A–87.) The basic purpose of the project "is to provide fuel to the central Ohio area." (AR 16, p. 149.) The Corps' stated overall purpose of the project is reasonably defined:

> to provide a safe, efficient, and economical means of transporting refined petroleum product from the terminal in Kenova, West Virginia (Cattlesburg Refinery) to a transportation/distribution center in Columbus for the purpose of supplying the current and future demands of the rapidly growing central Ohio areas with a proximate, non-Gulf coast supply of refined petroleum product.

(AR 16, p. 149.) To that end, the Corps reviewed numerous alternatives to meet the stated need, including transportation of the petroleum by barge, rail and truck.

Whether the amount to be transported is 50,000 barrels or something less, or something more,[16] transporting even 25,000 barrels per day, or half of the pipeline capacity, by truck would require hundreds of round trips per day. The Corps determined that,

> The logistics associated with this scenario would make it impracticable. The existing transportation and labor infrastructure ... do not exist to support this alternative. Construction of these facilities would be cost prohibitive. In addition, trucking this amount of product over 150 miles of highway cold result in increased adverse impacts to the environment and the general public in the form of highway accidents and subsequent release of product into the environment. Trucking the product is economically and logistically impracticable and could result in the potential for serious impacts to the environment and the general public. This alternative would not achieve the proposal's stated overall purpose and has thereby been eliminated from consideration.

(AR 16, 151–52.) The Corps quite clearly evaluated a range of alternatives. In its evaluation, the Corps recognized additional risks to the public that would be cause from the use of rail and truck to move petroleum product along a 150 mile route. Similarly, the Corps considered alternatives which included barging the product on one or more waterways and determined that both the risk to the environment and the cost of transportation exceed that of the proposed pipeline. (AR 16, p. 151.) Finally, the Corps reviewed alternative pipeline routes and found that other potential locations posed significant risks to population centers compared to the pipeline

---

**16.** According to the Corps' findings and ORPL's application, the estimated demand for petroleum products in the Central Ohio area by the year 2010 could exceed 140,000 barrels per day. (AR 16, p. 151.)

route proposed by ORPL. (AR 16, p. 155–157.)

This evaluation does not run head on into the admonition of the Seventh Circuit in *Simmons v. U.S. Army Corps of Eng'rs,* 120 F.3d 664, 669 (7th Cir.1997) that an agency may slip past the structures of NEPA by "contriv[ing] a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." The Corps' stated purpose was broadly defined to allow for alternatives. Based on the record before this Court, it is clear that the Corps evaluated those alternatives to assess whether each was a viable option to meet the projects' stated purpose. The Corps' determination to eliminate alternative means of transporting petroleum by barge, rail or truck, therefore is not arbitrary and capricious.

### (4.) *Impacts of Wildlife Habitat Loss and Forest Fragmentation*

The Hocking Hills State Forest is recognized as having important habitat areas for rare plant and animal species, especially its unfragmented forest areas that provide a safe habitat for neotropical songbirds. The National Audubon Society has recognized the Crane Hollow and Clear Creek Nature Preserves to be recognized as "Important Birding Areas." (AR 16, p. 131.) Cutting the 75–foot right-of-way construction along the FR–25 overgrown corridor will cause a loss of trees and wildlife habitat in these ecological areas. Clearing of the overgrown areas will likewise fragment the forest and will negatively impact the birds by allowing invasive non-native species to enter and compete for the remaining habitat. (AR 16, p. 103.)

The Corps concluded in its EA that the geological features along the pipeline route do not present a risk of significant impacts to the environment. The Corps concluded that the implementation of well-established geotechnical design and construction practices assure that the pipeline could be properly installed, maintained and decommissioned/abandoned without significant adverse impacts. (AR 16, 174–76.) The Corps acknowledged that clearing or widening of the pipeline's right-of-way "would cause noticeable fragmentation," (AR 16, p. 103), but specifically concluded that the impact would not be significant. (AR 16, p. 103.)

Plaintiffs argue that the Corps provided no analysis whatsoever on the loss of habitat and made no effort to establish how much habitat would be lost or what the impact of that loss would be on these important wildlife areas. Again, Plaintiffs assert that this the record is underdeveloped on this subject, in violation of the Corps' obligations under NEPA to engage in a special case-by-case judgment.

The wildlife habitat and forest fragmentation are both effects that should be considered by the Corps in assessing the significance of environmental impacts under the requirement for evaluating the "intensity" of environmental impacts due to the "unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critically areas." 40 C.F.R. § 1508.27(b)(3).

The Corps did not fail to address the forest fragmentation issue. (R16, p. 103.) The Corps indeed developed a significant discussion to the concerns expressed by the public commentators including specific concerns about bird, animal and plant species. (AR 16, p. 103, 165–67.) The record contains references to several scientific studies of fragmentation and edge effect, all of which indicate that impacts are minimal and are often accompanied by offsetting benefits. (AR 14B, p. 69–70.) Further, ORPL is required under its permit to

**974**

take precautions against invasive plant species by re-seeding the corridor with approved mixes to deter invasive plant growth. (AR 16, p. 24.)

In terms of addressing the issue of fragmentation, Plaintiffs insist that the Corps only addressed the potential for a single new predatory species, the cowbird. (AR 16, p. 103.) Although Plaintiffs describe the Corps analysis of the fragmentation issue in the EA as being limited to an assessment of the potential of the cowbird to enter the forest as an invasive species, this characterization, however, does not bear out in the administrative record given the existence of additional studies relating to fragmentation which confirm that the Corps did not act arbitrarily and capriciously in its determination that the clearing of the right-of-way in the Hocking Hills area would not cause significant environmental impacts.

The record contradicts Plaintiffs assertions that the Corps engaged in a constricted analysis that had no basis in science. The Corps also had feedback from the United States Fish and Wildlife Service which concluded that the pipeline would have no impact on any federally listed engaged species (AR, p. 4063–64), and comments from the U.S. Environmental Protection Agency expressing approval for the pipeline. (AR 14, p. 314–15.) The Corps worked closely with the Ohio Environmental Protection Agency and the Department of Natural Resources with regards to controls on invasive species resulting from the clearing of the pipeline's right-of-way. (AR 16, p. 166.) The Court concludes that the decision was not arbitrary and capricious.

**IV.**

 An agency's documents under NEPA cannot be held to a "standard of perfection." *Piedmont Heights Civic Club v. Moreland,* 637 F.2d 430, 436 (5th Cir.

1981). Plainly, "no matter how well the EIS [or other agency document] has been written, someone later can always find fault with it." *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 265 (6th Cir.1977). This Court's role of judicial review of the Corps' administrative decision to issue a Finding of No Significant Impact and to forego the more stringent requirements of an Environmental Impact Statement has been limited to a determination of whether the agency's final action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 704; *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *Sierra Club v. Slater,* 120 F.3d 623, 632 (6th Cir.1997). The Court concludes that the Corps' final determination "was based on a consideration of the relevant factors" and there has been "no clear error of judgment." *Citizens to Preserve Overton Park,* 401 U.S. at 416, 91 S.Ct. 814.

In light of the foregoing determinations, the Court concludes that summary judgment in favor of Plaintiffs on the administrative record here may not be granted. Conversely, the Defendants' Motion for Summary Judgment is meritorious. The Court concludes, under Federal Rule of Civil Procedure 56, that no genuine issue of material fact exits as to whether Defendants' decision to issue a Finding of No Significant Impact was arbitrary or capricious. Furthermore, the Court determines, based upon the record presented, that the Defendants took a "hard look" at the effects of the pipeline project as required by NEPA. Therefore, this Court upholds the sufficiency of the Environmental Assessment as a basis for the Finding of No Significant Impact. Finally, the Court concludes, based on the record presented, that the decision to not prepare an Environmental Impact Statement was not arbitrary or capricious. In light of these

conclusions, the Court finds the Plaintiffs' motions for injunctive relief without merit.

## V.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc. # 18) is **DENIED**; Federal Defendants' Motion for Summary Judgment (Doc. # 19) is **GRANTED**; and ORPL's Motion for Summary Judgment (Doc. # 21) is **GRANTED**. This matter likewise disposes of Plaintiffs' Motions for Preliminary Injunction (Docs. # 12 and # 15), which are **DENIED**.

**IT IS SO ORDERED.**